ATTACHMENT A

**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Deferred

Prosecution Agreement (the "Agreement") between the United States Department of Justice,

Criminal Division, Fraud Section and the United States Attorney's Office for the Eastern District

of Virginia (together, the "Offices") and ABB Ltd. ("ABB" or the "Company"), as well as the

plea agreements between ABB Management Services Ltd. ("ABB Management Services") and

ABB South Africa (Pty) Ltd. ("ABB South Africa") and the Offices.  Certain of the facts herein

are based on information obtained from third parties by the United States through its

investigation and described to ABB.  ABB hereby agrees and stipulates that the following

information is true and accurate.  ABB admits, accepts, and acknowledges that it is responsible

for the acts of its officers, directors, employees, and agents as set forth below.  Should the United

States pursue the prosecution that is deferred by this Agreement, ABB agrees that it will neither

contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding.  The

following facts took place during the relevant time period and establish beyond a reasonable

doubt the charges set forth in the criminal Information attached to the Agreement:

**Relevant Entities and Individuals**

1.     ABB was a company with core businesses focused on electrification, automation,

motion, and robotics technologies, organized under the laws of Switzerland and headquartered in

Switzerland.  ABB had subsidiaries in multiple countries around the world, including in South

Africa, Germany, Italy, and the United States.  ABB had a class of securities registered pursuant

to Section 12 of the Securities Exchange Act of 1934 (Title 15, United States Code, Section 78*l*)

and was required to file periodic reports with the U.S. Securities and Exchange Commission

A-1

("SEC"). Accordingly, during the relevant time period, ABB was an "issuer" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1.

2.      ABB Management Services was a wholly owned and controlled subsidiary of ABB, located in Zurich, Switzerland, that provided internal management services to local ABB operating entities. ABB Management Services was an agent of an issuer, ABB, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

3.      ABB South Africa was a majority-owned and wholly controlled subsidiary of ABB, located in Longmeadow, South Africa. ABB South Africa was an agent of an issuer, ABB, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

4.      ABB AG ("ABB Germany") was a wholly owned and controlled subsidiary of ABB, located in Mannheim, Germany. ABB Germany was an agent of an issuer, ABB, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

5.      "ABB Manager 1," a German citizen whose identity is known to the United States and the Company, was an employee of ABB Germany and an agent of an issuer, ABB, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

6.      "ABB Manager 2," a German citizen whose identity is known to the United States and the Company, was an employee of ABB Management Services and an agent of an issuer, ABB, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

7.      "ABB Manager 3," a German citizen whose identity is known to the United States and the Company, was an employee of ABB Germany and ABB South Africa, and an agent of an issuer, ABB, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

8.      "ABB Manager 4," a German citizen whose identity is known to the United States and the Company, was an employee of ABB Management Services and an agent of an issuer, ABB, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

9.      Eskom Holdings Limited ("Eskom") was a South African state-owned and state-controlled energy company headquartered in Sunninghill, South Africa, that operated to generate and transmit electricity in South Africa. The South African government was the sole owner of Eskom shares. Eskom was controlled by the government of South Africa and performed functions that South Africa treated as its own. Eskom was an "instrumentality" of a foreign government, and Eskom's officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

10.     "South African Official," a South African citizen whose identity is known to the United States and the Company, was a high-ranking executive of Eskom. South African Official was a "foreign official" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

11.     "Subcontractor 1," an entity the identity of which is known to the United States and the Company, was a South African company owned by Subcontractor 1 Executive.

12.     "Subcontractor 1 Executive," a South African citizen whose identity is known to the United States and the Company, was an executive of Subcontractor 1.

13.     "Subcontractor 2," an entity the identity of which is known to the United States and the Company, was a South African company 65 percent owned by a director of Subcontractor 2 and 35 percent owned by a South African trust entity, the identity of which is known to the United States and the Company.

A-3

### Overview of the Scheme

14.    In or about and between 2014 and 2017, ABB, through certain of its agents, knowingly and willfully conspired and agreed with others to corruptly provide payments and things of value to, and for the benefit of, a foreign official to influence acts and decisions of the foreign official in his or her official capacity, to induce the foreign official to improperly influence the decisions of Eskom, and to secure an improper advantage in order to obtain and retain business for ABB.

15.    In furtherance of the scheme, ABB and its co-conspirators made bribe payments intended for the benefit of South African Official, funneled money to unqualified subcontractors that ABB understood to be providing benefits to South African Official, and inflated the cost of work to be performed by ABB for Eskom.  ABB and its co-conspirators also produced false and misleading accounting documents and engaged in sham negotiations to reach pre-agreed prices on transactions in order to generate and conceal the funds used to provide benefits to South African Official.  In carrying out the scheme, ABB and its co-conspirators used the means and instrumentalities of interstate commerce.

### A.    Hiring Subcontractor 1 to Help ABB Win the Kusile Contract

16.    In or around June 2007, the South African government approved the construction of a large coal-fired power plant at Kusile, in Witbank, South Africa (the "Kusile Project"). Eskom awarded the first engineering contracts for the Kusile Project in or around February 2008.

17.    In or around July 2013, ABB learned that Eskom was planning to cancel certain previously issued engineering contracts for control and instrumentation ("C&I") work on the Kusile Project and to consider other contractors.  In or around March 2014, in an effort to win

the C&I contract and other Eskom projects, ABB created a "Capture Team" led by ABB Manager 1 and also including ABB Manager 2, ABB Manager 3, and ABB Manager 4.

18.     In or around October 2014, ABB formed an internal consortium consisting of ABB South Africa, ABB Germany, and ABB's Italian subsidiary, with business oversight provided by ABB Management Services, to bid for the C&I contract and, if successful, to manage ABB's work on the Kusile Project. During the relevant period, and in connection with the conduct described herein, ABB Managers 1, 2, 3, and 4 acted on behalf of the internal consortium and managed its activities in South Africa.

19.     ABB was aware that, pursuant to South Africa's Broad-based Black Economic Empowerment Act of 2003 and the South African government policies implementing it, and other subsequently promulgated policies, including the Supplier Development & Localization Plan (collectively, the "BEE program"), ABB's ability to obtain contracts with Eskom depended, in part, on the engagement of certain local South African subcontractors.

20.     In or around April 2014, South African Official introduced ABB Manager 2 to Subcontractor 1 Executive, describing Subcontractor 1 Executive as a "friend" of South African Official, and stating that Subcontractor 1 ran a company that would be "interesting" for ABB to work with in South Africa. In response, ABB Manager 2 asked ABB Manager 3 and another ABB employee to investigate Subcontractor 1 as a partner, including its "political network," and to get Subcontractor 1's bank account information to establish Subcontractor 1 as an ABB subcontractor.

21.     On or about June 3, 2014, when preparing to bid on the Kusile Project, ABB Manager 2 emailed ABB Manager 3, asking him about "local sponsors," which ABB Manager 2 described as "the ones who don't do anything for us but cash in because they are [members of a

South African political party] etc.?" The next day, on or about June 4, 2014, ABB Manager 3 invited Subcontractor 1 Executive to a meeting to discuss Subcontractor 1's potential work with ABB as a BEE partner.

22.    Despite Subcontractor 1's poor technical qualifications and lack of experience, ABB accepted a proposal from Subcontractor 1 to become an ABB subcontractor in or around June 2014.

23.    In or around October 2014, Subcontractor 1 submitted a proposal for subcontracting work on the Kusile Project to ABB, which increased ABB's costs on the Kusile Project by approximately 100 million South African rand, the equivalent of approximately $9 million at the time.

24.    On or about October 15, 2014, ABB submitted its bid for the C&I contract, including an "early works" order for preparatory work. After learning that ABB's bid was approximately 500 million South African rand (the equivalent of approximately $45 million at the time) higher than the closest competing bid, ABB Manager 3 told ABB Manager 1 that Subcontractor 1 Executive should "prove he is worthwhile" to ABB.

25.    On or about December 8, 2014, ABB Manager 1 received confidential, internal Eskom information from South African Official and Subcontractor 1 Executive regarding the process and schedule Eskom would follow in awarding the C&I contract, and included that information in a December 8, 2014 email to ABB Managers 2, 3, 4, and others.

26.    In or around January 2015, while ABB was engaged in final negotiations with Eskom for award of the C&I contract, Subcontractor 1 Executive on multiple occasions provided ABB Manager 1 and ABB Manager 3 with confidential Eskom information to provide an improper advantage to ABB in obtaining the C&I contract. For example, Subcontractor 1

A-6

Executive sent an email to ABB Manager 3's personal email address, attaching a confidential memorandum from a law firm advising Eskom during the negotiations, reporting on the status of those negotiations and the parties' respective positions. To conceal the receipt of confidential Eskom information, ABB Manager 3 deleted the email received from Subcontractor 1 Executive. ABB also received confidential Eskom pricing information from Subcontractor 1 Executive during the contract negotiations

27.    On or about February 24, 2015, the Eskom board approved ABB's selection for the C&I contract, and on or about March 10, 2015, Eskom announced that ABB had been awarded the C&I contract. The next day, on or about March 11, 2015, Eskom announced that certain top Eskom officials, including South African Official, had been suspended from their positions at Eskom. ABB learned that, notwithstanding the suspension of South African Official, the prior arrangements would continue to be honored, including the award of the C&I contract to ABB and the use of Subcontractor 1 as ABB's subcontractor, with the understanding that South African Official would receive a portion of the money paid by ABB to Subcontractor 1.

28.    ABB and Eskom formally entered into the C&I contract on or about March 13, 2015.

29.    On or about May 13, 2015, ABB South Africa entered into a subcontract with Subcontractor 1 to handle "site services skills development" and "industrialization" for the C&I contract. The agreement with Subcontractor 1 required ABB South Africa to advance 10 percent of the value of the subcontract to Subcontractor 1, upon completion of certain specified prerequisites. Despite the payment having not yet become due under the subcontract, ABB Manager 2 advised that making an advance payment quickly was "important for our relationship to No. 1," which was a reference to South African Official.

A-7

30.     In response, ABB Manager 3 ensured that the advance payment—in the amount of approximately 9.6 million South African rand, the equivalent of approximately $798,000 at the time—was made to Subcontractor 1, while knowing that the funds were intended, at least in part, as a bribe for South African Official. ABB South Africa falsely recorded the payment in its books and records as an "advanced payment" for services to be performed by Subcontractor 1 under the subcontract when, in reality, a portion of the payment was intended to be used as a bribe for South African Official.

31.     Following ABB's advance payment to Subcontractor 1, ABB learned of a dispute between Subcontractor 1 and South African Official, suggesting that the advance payment had not been delivered to South African Official, as ABB intended. In or around May 2015, ABB Manager 1 unsuccessfully attempted to mediate the dispute at a meeting of Subcontractor 1 Executive, South African Official, and ABB Manager 1.

32.     Soon after entering into the subcontract with Subcontractor 1, ABB began to experience problems with Subcontractor 1's work, in part due to the inexperience of the personnel Subcontractor 1 provided for work on the Kusile Project.

**B.    Use of Variation Orders to Drive Work and Pay Money to Subcontractor 2**

33.     In or around July 2015, South African Official returned from suspension and resumed a senior position at Eskom with authority and influence over the Kusile project.

34.     Shortly thereafter, in or around October 2015, ABB Manager 1 instructed ABB Manager 3 to contact Subcontractor 2 so that ABB could establish Subcontractor 2 as an ABB subcontractor for the Kusile Project.

35.     Between in or about November 2015 and in or about February 2016, ABB Manager 3 and ABB Manager 4 sought to onboard Subcontractor 2 as an approved ABB

subcontractor, requiring Subcontractor 2 to undergo ABB's due diligence process. Subcontractor 2 failed multiple aspects of ABB's routine due diligence, raising questions among ABB personnel based in South Africa and the United States about Subcontractor 2's qualifications and financial stability.

36.    On or about February 2, 2016, ABB Manager 3 emailed an ABB South Africa project manager and multiple other ABB personnel, directing that Subcontractor 2 be established as an approved subcontractor "as fast as possible." This required ABB procurement and compliance-related employees in the United States to draft a waiver of ABB's standard subcontractor qualification requirements. On or about February 15, 2016, ABB Manager 4 emailed comments on the waiver to other ABB personnel in an effort to have Subcontractor 2 approved as an ABB subcontractor. On or about February 16, 2016, ABB Manager 4's comments were forwarded by email to ABB personnel in the United States for additional follow-up and approval.

37.    Despite concerns about Subcontractor 2's qualifications, ABB subsequently granted the requested waiver with respect to Subcontractor 2 premised on Subcontractor 2 working through other subcontractors who were qualified for the job.

38.    In furtherance of the scheme, ABB Manager 1 and South African Official agreed to inflate the cost of ABB's work on the Kusile Project via contract "variation orders." The scheme worked as follows:

a.    At South African Official's direction, Eskom proposed a variation order for the Kusile Project.

b.    Prior to ABB South Africa quoting a price for the variation order, ABB Manager 1 agreed with South African Official on a target price for the variation order.

A-9

As a precondition to winning the variation order contract, South African Official required ABB South Africa to agree to hire Subcontractor 2.

      c.     To conceal the scheme, ABB and Eskom engaged in sham negotiations, the result of which was a contract for the variation order at or near the target price upon which ABB Manager 1 and South African Official had previously agreed.

      d.     As required by South African Official, ABB South Africa employed Subcontractor 2 for its work on each variation order.

      e.     Payments to Subcontractor 2 were intended, at least in part, to ultimately benefit South African Official (including via South African Official's close relative, who served as a director of Subcontractor 2 and also held an ownership interest in Subcontractor 2 through a trust soon after ABB engaged Subcontractor 2 to work on the Kusile Project).

39.     ABB South Africa carried out four variation orders on the Kusile Project: a variation order to accelerate ABB's work on Unit 1 of the Kusile Project (the "Unit 1 acceleration variation order") and three additional variation orders focusing on multiple aspects of work at the Kusile Project.

40.     In connection with the Unit 1 acceleration variation order, ABB approved a payment by ABB South Africa in or around March 2016 to Subcontractor 2 of approximately 11.6 million South African rand, the equivalent of approximately $754,000 at the time. ABB South Africa falsely recorded the payment in its books and records as a payment for "work done" by Subcontractor 2 under the subcontract when, in reality, a portion of the payment was intended to be used as a bribe for the benefit of South African Official.

41.     On or about March 8, 2016, Eskom approved the Unit 1 acceleration variation order for approximately 249 million South African rand, the equivalent of approximately $12.5 million at the time, just below the target price ABB had agreed upon with South African Official. The Unit 1 acceleration variation order specifically required ABB to hire Subcontractor 2.

42.     ABB South Africa entered into three other variation orders with Eskom, which were valued at approximately 769 million South African rand, the equivalent of approximately $44 million at the time. After entering into these variation orders, on or about March 3, 2017, ABB Manager 1 explained to another ABB employee that ABB Manager 1 and South African Official pre-agreed on prices before any official variation order negotiations occurred, and that the prices reflected what Eskom was willing to pay. ABB Manager 1 further explained that ABB could secure additional, potentially lucrative contracts with Eskom provided that ABB worked with Eskom's "preferred supplier," Subcontractor 2.

### False Books and Records

43.     In connection with the scheme detailed above to pay bribes to a foreign official in South Africa, and in order to conceal the corrupt payments, between in or about 2014 and 2017, ABB, acting through its employees and agents, knowingly and willfully conspired and agreed with others to maintain false books, records, and accounts that did not accurately and fairly reflect the transactions and dispositions of its assets.

44.     ABB, as an issuer of securities, was required to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its assets. 15 U.S.C. § 78m(b)(2). ABB South Africa's books, records, and accounts were consolidated into ABB's financial statements, including the financial statements ABB filed with the SEC. ABB, through ABB Managers 1, 2, 3, and 4 and others, knowingly and

willfully conspired and agreed with others to falsely record in the Company's internal accounting records payment of invoices from Subcontractor 1 and Subcontractor 2, which did not reflect ABB's knowledge that portions of ABB South Africa's payments to Subcontractor 1 and Subcontractor 2 were intended as bribes for the benefit of South African Official. By recording these payments as legitimate expenses, ABB concealed the true nature of these payments and maintained false books, records, and accounts that did not accurately and fairly reflect the transactions and dispositions of its assets.

45.     On or about February 25, 2016, ABB filed Form 20-F with the SEC for the fiscal year ending December 31, 2015. This filing included ABB's consolidated financial statements, which incorporated the accounts of ABB and its subsidiaries, including ABB South Africa. The consolidated financial statements in ABB's filing falsely included as a legitimate business expense for products and services ABB South Africa's corrupt "advanced payment" to Subcontractor 1.

46.     On or about March 10, 2017, ABB filed Form 20-F with the SEC for the fiscal year ending on December 31, 2016. This filing included ABB's consolidated financial statements, which incorporated the accounts of ABB and its subsidiaries, including ABB South Africa. The consolidated financial statements in ABB's filing falsely included as a legitimate business expense for products and services ABB South Africa's corrupt variation order payments to Subcontractor 2.